TaiDoc Tech. Corp. v. OK Biotech Co., Ltd., 2015 NCBC 71.

STATE OF NORTH CAROLINA        IN THE GENERAL COURT OF JUSTICE
                                     SUPERIOR COURT DIVISION
MECKLENBURG COUNTY                 12 CVS 20909

TAIDOC TECHNOLOGY
CORPORATION,

        Plaintiff,

v.

        **ORDER AND OPINION**

OK BIOTECH CO., LTD.,

        Defendant.

{1}    **THIS MATTER** is before the Court upon Defendant OK Biotech Co., Ltd.'s ("Defendant" or "OK Biotech") Motion for Summary Judgment on its Twelfth Affirmative Defense of Release ("Summary Judgment Motion" or "Motion") in the above-captioned case. After considering OK Biotech's Motion, briefs in support of and opposition to the Motion, the appropriate evidence of record, and the arguments of counsel at the May 15, 2015 hearing held in this matter, the Court hereby **DENIES** OK Biotech's Motion.

> *Erwin, Bishop, Capitano & Moss, P.A., by Joseph W. Moss, Jr. and J. Daniel Bishop, for Plaintiff TaiDoc Technology Corporation.*

> *Foley & Lardner LLP, by George C. Beck, Michael J. Lockerby, and Brian J. Kapatkin, and Clements Bernard PLLC, by Christopher L. Bernard and Lawrence A. Baratta, Jr., for Defendant OK Biotech Co., Ltd.*

Bledsoe, Judge.

I.

PROCEDURAL HISTORY AND RELEVANT FACTUAL BACKGROUND

{2}    While findings of fact are not necessary or proper on a motion for summary judgment, "it is helpful to the parties and the courts for the trial judge to articulate a summary of the material facts which he considers are not at issue and which justify entry of judgment." *Collier v. Collier*, 204 N.C. App. 160, 161–62, 693 S.E.2d 250, 252 (2010) (quotations and citation omitted). Therefore, the Court

limits its factual recitation to the undisputed material facts necessary to decide the Motion, and not to resolve issues of material fact.

## A.   The Prior Action Involving DDI

{3}   Plaintiff TaiDoc Technology Corporation ("TaiDoc") has been involved in prior litigation with non-party Diagnostic Devices, Inc. ("DDI"), and has brought the current action against Defendant OK Biotech, all primarily arising out of DDI's purchase of blood glucose meters and test strips from TaiDoc for resale in the United States between 2005 and 2008 and DDI's decision in 2008 to terminate its relationship with TaiDoc and purchase these products instead from OK Biotech.

{4}   The first lawsuit was filed by DDI in Mecklenburg County Superior Court against several of TaiDoc's customers, alleging that these customers were interfering with DDI's Sales Exclusive Agreement with TaiDoc (the "149-Pharma" case).[1]  On April 4, 2008, the 149-Pharma case was removed to the United States District Court for the Western District of North Carolina and assigned case number 3:08CV-149.

{5}   On December 5, 2008, DDI filed another complaint, this time against TaiDoc in the United States District Court for the Western District of North Carolina (case number 3:08CV-559) (the "2008 Case"), alleging breach of the Sales Exclusive Agreement, libel, tortious interference with prospective advantage, violation of the federal Lanham Act, and unfair competition.  (Def.'s Br. Supp. Mot., Ex. 1-1C.)

{6}   On June 18, 2010, the 149-Pharma case and the 2008 Case were consolidated for trial.  (Def.'s Br. Supp. Mot., p. 1, n.3.)

---

[1] On March 1, 2006, DDI and TaiDoc entered into the Sales Exclusive Agreement.  (Def.'s Br. Supp. Mot., Ex. 1-1C at p. 3.)  The Sales Exclusive Agreement "prohibited DDI from selling any competing products within the defined 'territory' of the United States and provided for confidentiality of information exchanged in the course of the relationship." (Pl.'s Resp. Opp. Mot., pp. 3–4 (citing Def.'s Br. Supp. Mot., Ex. 1-1C at pp. 3–6).)  The Sales Exclusive Agreement was amended October 19, 2006 and December 3, 2007, expanding the product list and territory, extending the original term by five years to March 1, 2015, and reaffirming the parties' confidentiality obligation.  (Def.'s Br. Supp. Mot., Ex. 1-1C at pp. 3–4.)

{7} On September 7, 2011, Prodigy Diabetes Care, LLC ("Prodigy"),[2] Mr. Richard Admani ("Admani"), and Mr. Ramzi Abulhaj ("Abulhaj")[3] (collectively with DDI, the "DDI Parties") were joined in the 2008 Case as third-party defendants by TaiDoc. (Pl.'s Resp. Opp. Mot., p. 5; *see* Def.'s Br. Supp. Mot., Exs. 1-1F, 1-1G, 1-1I.) TaiDoc asserted in its counterclaims that beginning in 2009, DDI, while aware of its debts and obligations to TaiDoc, transferred TaiDoc's trade secrets to affiliates, subsidiaries, and or related companies, including Prodigy. (Def.'s Br. Supp. Mot., Ex. 1-1E.) TaiDoc's claims against the DDI Parties included, *inter alia*, misappropriation of trade secrets, unjust enrichment, fraud, fraudulent conveyance, and unfair and deceptive trade practices. (Def.'s Br. Supp. Mot., Ex. 1-1E.)

{8} DDI and one of TaiDoc's customers, Pharma Supply, settled and filed a stipulation of dismissal in the 149-Pharma case on March 12, 2012. (Pl.'s Resp. Opp. Mot., p. 5.) TaiDoc then stipulated to a voluntary dismissal of its counterclaim for misappropriation of trade secrets against the DDI Parties, pursuant to which the federal court entered an order dismissing the misappropriation of trade secrets claim with prejudice. (Def.'s Br. Supp. Mot., Exs. 1-1F, 1-1G.)

{9} The 2008 Case was then tried in federal court before the Honorable Max O. Cogburn, Jr., and on March 23, 2012, the jury returned a verdict that was not decisively in favor of either TaiDoc or the DDI Parties. (Def.'s Br. Supp. Mot., p. 1; *see* Pl.'s Resp. Opp. Mot., Ex. 13, Verdict Form.) On TaiDoc's counterclaims, the jury found that DDI had breached the Sales Exclusive Agreement, Abulhaj, Admani, and DDI had not engaged in acts constituting fraud, and DDI had committed an unfair trade practice. (Pl.'s Resp. Opp. Mot., Ex. 13, Verdict Form.) Specifically, the jury found that DDI misrepresented its intent to be bound by the confidentiality provisions of the Sales Exclusive Agreement, DDI delivered TaiDoc's confidential information to OK Biotech, DDI asked TaiDoc to file a 510K application

---

[2] Prodigy at all relevant times was and currently is an affiliate, subsidiary, and/or related company of DDI. (Compl. ¶ 6; *see* Def.'s Br. Supp. Mot., p. 5, fn. 6.)

[3] It appears undisputed that Admani and Abulhaj were the dominating members, managers, shareholders, officers, and directors of DDI and Prodigy. (Compl. ¶ 9.)

with the intent to use TaiDoc's competitors to develop identical products using TaiDoc's confidential information,[4] "DDI falsely represented to TaiDoc that it would use a 510K filed in DDI's name in furtherance of TaiDoc's business and/or to continue its business relationship with TaiDoc," and "DDI failed to disclose to TaiDoc that it had entered into discussions with OK Biotech . . . prior to requesting [that] TaiDoc file a 510K in DDI's name." (Pl.'s Resp. Opp. Mot., Ex. 13, Verdict Form.)

{10} After the verdict, the parties to the 2008 Case agreed to settle the case by a written agreement, and on March 30, 2012, before entry of final judgment, TaiDoc, DDI, Prodigy, Admani, and Abulhaj executed a Settlement Agreement and Release ("Release Agreement"), (Def.'s Br. Supp. Mot., Ex. 2), and a stipulation of dismissal with prejudice, pursuant to which the federal court entered an order dismissing the 2008 Case, (Def.'s Br. Supp. Mot., Ex. 1-1I). Defendant OK Biotech was not a signatory to the Release Agreement. (*See* Def.'s Br. Supp. Mot., Ex. 2.)

B. The Prior Federal Court Action Involving OK Biotech

{11} On May 10, 2012, approximately six weeks after executing the Release Agreement, TaiDoc sued OK Biotech and John Does 1–5 in the United States District Court for the Eastern District of Pennsylvania, Case No. 2:12–cv–02566. The case was later transferred to the Western District of North Carolina and designated as Case No. 3:12-cv-00654 (the "2012 Trade Secret Litigation").

{12} TaiDoc's claims against OK Biotech in the 2012 Trade Secret Litigation are similar to its claims against OK Biotech in the current action, excluding a claim for violation of Section 43(a) of the federal Lanham Act.

---

[4] Medical devices such as the blood glucose meters and test strips TaiDoc sold to DDI are required to be registered with the United States Food and Drug Administration ("FDA") by submitting a 510K Registration ("510K(s)"). (Compl. ¶ 40; *see* Def.'s Br. Supp. Mot., Ex. 1-1C.) While portions of the 510Ks are available to the public, confidential and proprietary information is kept private. (Compl. ¶ 41; *see* Def.'s Br. Supp. Mot., Ex. 1-1C.)

{13}    On October 30, 2012, OK Biotech filed a motion to dismiss the 2012 Trade Secret Litigation in federal court in Charlotte, and TaiDoc voluntarily dismissed its claims without prejudice on November 16, 2012.

C.    The Current Action Involving OK Biotech

{14}    Later on the same day that TaiDoc voluntarily dismissed its claims in the 2012 Trade Secret Litigation, TaiDoc commenced the current action in this Court against OK Biotech by filing a Rule 3 Summons and Application and Order Extending Time to File Complaint.

{15}    On December 6, 2012, TaiDoc filed its Complaint in this action, generally alleging that OK Biotech was involved in an unlawful scheme and conspiracy with DDI and Prodigy "to obtain and use TaiDoc's confidential and proprietary information and trade secrets to unfairly compete with TaiDoc" and that "OK Biotech independently interfered with TaiDoc's contract with DDI and with prospective business opportunities, misappropriated trade secrets and engaged in unfair and deceptive acts and practices and unfair competition." (Compl. ¶ 10.)

{16}    TaiDoc brought claims against OK Biotech for fraud (as an alleged co-conspirator with DDI), facilitating fraud, aiding and abetting fraud, misappropriation of trade secrets under N.C. Gen. Stat. § 66-152 *et seq.*, unfair trade practices and unfair competition under N.C. Gen. Stat. § 75-1.1 *et seq.*, tortious interference with contract, tortious interference with prospective economic advantage, unjust enrichment, and injunctive relief. (*See* Compl., pp. 14, 16, 17, 19, 22, 24–26.)

{17}    On December 24, 2012, Prodigy transferred and assigned ownership and registration of several 510Ks to OK Biotech by written document (the "Transfer and Assignment of 510Ks"). (Def.'s Br. Supp. Mot., Ex. 6.)

{18}    On February 6, 2013, DDI and Prodigy merged, and Prodigy became DDI's successor entity. (Def.'s Br. Supp. Mot., p. 5, fn. 6.)

{19}    On February 14, 2013, OK Biotech designated this action as a mandatory complex business case, and on February 20, 2013 the case was assigned to this Court (Murphy, J.) and subsequently assigned to the undersigned on July 1, 2014.

{20}     On March 19, 2013, OK Biotech acquired a forty-five percent (45%) minority membership interest in Prodigy from Admani and Abulhaj.  (Def.'s Br. Supp. Mot., Ex. 5.)

{21}     On April 29, 2014, OK Biotech entered into an Assignment and Designation of Settlement Agreement and Contingent Release of Indemnity ("Designation of Release Agreement") with Prodigy.  (Def.'s Br. Supp. Mot., Ex. 9.)

{22}     On November 17, 2014, OK Biotech filed a Rule 12(c) Motion for Judgment on the Pleadings, which this Court converted into a motion for summary judgment by Order and Opinion dated March 16, 2015.

{23}     OK Biotech refiled its Rule 12(c) Motion as the Summary Judgment Motion on March 20, 2015; TaiDoc filed its Response on May 1, 2015; and OK Biotech filed its Reply on May 6, 2015.  This Court held a hearing on OK Biotech's Summary Judgment Motion on May 15, 2015.

{24}     The time for briefing, submissions, and arguments has now passed, and the Motion is ripe for resolution.

## II.

## LEGAL STANDARD

{25}     "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law.'"  *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (quoting N.C. R. Civ. P. 56(c) (2011)).  A fact is "material" if its "resolution . . . is so essential that the party against whom it is resolved may not prevail."  *McNair v. Boyette*, 282 N.C. 230, 235, 192 S.E.2d 457, 460 (1972) (quotations and citations omitted).  The moving party bears "'the burden of clearly establishing lack of a triable issue' to the trial court,"  *N.C. Farm Bureau Mut. Ins. Co. v. Sadler*, 365 N.C. 178, 182, 711 S.E.2d 114, 116 (2011) (quoting *N.C. Nat'l Bank v. Gillespie*, 291 N.C. 303, 310, 230 S.E.2d 375, 379 (1976)), and may meet this burden by proving the opposing party's claims are "barred by an affirmative defense."  *Variety Wholesalers*, 365 N.C. at

523, 723 S.E.2d at 747 (quoting *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000)).

## III.

## ANALYSIS

{26} OK Biotech bases its Motion on the Mutual Release provision of the March 30, 2012 Release Agreement between TaiDoc, DDI, Prodigy, Admani, and Abulhaj. Although acknowledging that it is neither a party to nor an intended beneficiary of the Release Agreement, OK Biotech contends that it is nonetheless a "successor," "member," and "designee" under the Release Agreement, and thus is released from TaiDoc's claims in this action, by virtue of certain transactions OK Biotech entered after the Release Agreement was executed. As explained below, the Court disagrees with OK Biotech's contentions and concludes that OK Biotech's Motion for Summary Judgment on its Twelfth Affirmative Defense of Release should be denied.

{27} The Release Agreement provides in relevant part as follows:

> 4. **Mutual Releases**. Each Party, defined in this Agreement as including the Party's predecessors, <u>successors</u>, directors, officers, managers, <u>members</u>, and their respective heirs, executors and <u>designees</u>, hereby releases, remises, quitclaims, and forever discharges the other Parties (including that party's predecessors, <u>successors</u>, directors, officers, managers, <u>members</u>, and their attorneys and experts retained in this Action for acts within the scope of their retention), and their respective heirs, executors and <u>designees</u>, from any and all claims whatsoever brought in, or that could have been brought in, the Action, or that in any way relate to the claims brought in, or that could have been brought in, the Action, whether in law or in equity, whether known or unknown, except solely for claims to enforcement of the terms of this Agreement.

((Def.'s Br. Supp. Mot., Ex. 2, ¶ 4) (underline emphasis added).)

{28} OK Biotech argues that it became a "successor" under the Release Agreement because on March 19, 2013, OK Biotech purchased a forty-five percent (45%) membership interest in Prodigy from Admani and Abulhaj and thereby succeeded to the rights Admani and Abulhaj had obtained as parties released from TaiDoc's claims under the Release Agreement. (Def.'s Br. Supp. Mot., p. 16–17.)

OK Biotech contends that it became a "member" under the Release Agreement because its purchase of a membership interest in Prodigy caused OK Biotech to become a member of Prodigy under Prodigy's Amended and Restated Operating Agreement and thereby a released "member" under the Release Agreement. (Def.'s Br. Supp. Mot., pp. 7–8, 14, Ex. 2.) OK Biotech contends that it became a "designee" under the Release Agreement because on December 24, 2012, Prodigy transferred and assigned ownership and registration of several 510Ks to OK Biotech in the Transfer and Assignment of 510Ks document between Prodigy and OK Biotech, (Def.'s Br. Supp. Mot., Ex. 6), and thereafter, on April 29, 2014, Prodigy appointed OK Biotech as its "designee" in the Designation of Release Agreement, (Def.'s Br. Supp. Mot., pp. 15–16, Ex. 9), thereby extending the benefits of the Release Agreement to OK Biotech. (*See, e.g.*, Def.'s Br. Supp. Mot., p. 11.)

{29}  The Court will address each of OK Biotech's contentions in turn.

{30}  As an initial matter, our courts have recognized that the affirmative defense of release is proven by showing that the parties entered into a private agreement "which gives up or abandons a claim or right to the person against whom the claim exists or the right is to be enforced or exercised." *Fin. Servs. of Raleigh, Inc. v. Barefoot*, 163 N.C. App. 387, 392, 594 S.E.2d 37, 41 (2004) (quotations and citation omitted); *Adder v. Holman & Moody, Inc.*, 288 N.C. 484, 492, 219 S.E.2d 190, 195 (1975) ("A release is the giving up or abandoning of a claim or right to the person against whom the claim exists or the right is to be exercised.").

{31}  "Releases are contractual in nature and their interpretation is governed by the same rules governing interpretation of contracts." *Chemimetals Processing, Inc. v. Schrimsher*, 140 N.C. App. 135, 138, 535 S.E.2d 594, 596 (2000) (citation omitted); *Fin Servs. Of Raleigh*, 163 N.C. App. at 395, 594 S.E.2d at 42 ("Since releases are contractual in nature, we apply the principles governing interpretation of contracts when construing a release.") (citation omitted).  As a result, "[w]hen the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court[,] and the court cannot look beyond the terms of the contract to determine the intentions of the parties." *Piedmont Bank & Trust Co. v.*

*Stevenson*, 79 N.C. App. 236, 240, 339 S.E.2d 49, 52 (internal citations omitted), *aff'd per curiam,* 317 N.C. 330, 344 S.E.2d 788 (1986). Thus, "[i]t must be presumed the parties intended what the language used clearly expresses, and the contract must be construed to mean what on its face it purports to mean." *Hartford Accident & Indem. Co. v. Hood*, 226 N.C. 706, 710, 40 S.E.2d 198, 201 (1946) (internal citations omitted).

{32}    Here, TaiDoc and OK Biotech both contend that the Release Agreement is an unambiguous, fully integrated written contract and that the resolution of material factual issues is unnecessary to interpret the parties' intent in entering the Release Agreement. (Def.'s Br. Supp. Mot., p. 10; Def.'s Reply Supp. Mot., pp. 2, 10, 19; Pl.'s Resp. Opp. Mot., pp. 9–10.) The Court agrees. *See Piedmont Bank & Trust Co.*, 79 N.C. App. at 240, 339 S.E.2d at 52.

## A.    Successor

{33}    OK Biotech's "successor" argument is premised on its claim that OK Biotech became a "successor" to Admani and Abulhaj under the Release Agreement by purchasing from them a membership interest in Prodigy. (Def.'s Br. Supp. Mot., pp. 16–17.)

{34}    North Carolina courts have "defined the term 'successor' to mean [o]ne that succeeds or follows; one who takes the place that another has left, and sustains the like part or character; one who takes the part of another by succession." *Terres Bend Homeowners Assoc. v. Overcash*, 185 N.C. App. 45, 51, 647 S.E.2d 465, 470 (2007) (alteration in original) (quoting *Rosi v. McCoy*, 319 N.C. 589, 593, 356 S.E.2d 568, 570 (1987)).[5] In construing the term "successor," the Court should consider the "nature of the part or character to be taken" and the "natural meaning of the term" as used in context of the parties' agreement. *Id.* at 51–52, 647 S.E.2d at 470 (citation and quotations omitted).

---

[5] Similarly, Black's Law Dictionary defines "successor" as "1. A person who succeeds to the office, rights, responsibilities, or place of another; one who replaces or follows a predecessor. 2. A corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation." *Black's Law Dictionary* 1473 (8th ed. 2004).

{35} Applying these principles here, the Court is persuaded that the term "successors," as used in the context of the Release Agreement – *i.e.*, as one of "predecessors, successors, directors, officers, managers, members, and their respective heirs, executors and designees" – contemplates either a successor legal entity, which stands in the shoes of a party typically through merger, acquisition, or other legal means of succession, or a successor to a person in the testamentary sense, which typically involves a successor standing in the shoes of a predecessor upon a predecessor's incapacity or death. Neither type of "successor" is created in these circumstances where OK Biotech purchased a portion of Admani's and Abulhaj's interests in Prodigy. Indeed, OK Biotech did not become a successor to DDI or Prodigy through its purchase – there was no merger, acquisition, or other legal form of succession to either DDI's or Prodigy's rights under the Release Agreement – and OK Biotech did not become a successor to either Admani or Abulhaj in a testamentary sense, a result obviously not contemplated or compelled by OK Biotech's purchase.

{36} Moreover, because a "successor" by definition stands in the shoes of his predecessor, a "successor" cannot succeed to rights that his predecessor did not have. *See Black's Law Dictionary* at 1473 ("A successor in interest retains the same rights as the original owner, with no change in substance.") As applied here, even if OK Biotech became a legal "successor" to the release that Admani and Abulhaj obtained under the Release Agreement, that release was only a release of the claims that TaiDoc had against Admani and Abulhaj – not a release of any claims TaiDoc had against OK Biotech at the time of the Release Agreement, or, in particular, of the claims TaiDoc has asserted against OK Biotech in this action. Indeed, the Release Agreement specifically defines "Parties" to include only DDI, Prodigy, Admani, Abulhaj, and TaiDoc – the signatories to the Agreement – and the only other persons or entities released in the Release Agreement are those who are released through their specific, identified legal relationship to the Parties. OK Biotech was not identified or contemplated as a released party at the time the "Parties" entered the Release Agreement, and North Carolina law is clear that

"[w]hen a release . . . is given in good faith to one of two or more persons liable in tort for the same injury . . . [i]t does not discharge any of the other tort-feasors from liability for the injury . . . *unless its terms so provide*." N.C. Gen. Stat. § 1B-4 (2014) (emphasis added).  In short, OK Biotech's claim to be a "successor" to the Release Agreement, even if successful, cannot permit OK Biotech to succeed to a release of TaiDoc's claims against OK Biotech in this litigation because those claims were not released in the Release Agreement.  *See, e.g.*, *Chemimetals*, 140 N.C. App. at 138, 535 S.E.2d at 596 (holding "the plain terms of the release indicate its scope does not bar the second action" because the "defendants in the second action do not fall within any of those persons or entities denominated within the release" even though the factual allegations are nearly identical).  *Cf. Sword v. DOT*, 121 N.C. App. 213, 464 S.E.2d 715 (1995), *disc. rev. denied*, 342 N.C. 664, 467 S.E.2d 734 (1996) (settlement releasing "'all other persons, firms, corporations, associations or partnerships'" released the North Carolina Department of Transportation from liability because it was a "person" within the release); *Sykes v. Keiltex Indus.*, 123 N.C. App. 482, 485, 473 S.E.2d 341, 343 (1996) (settlement releasing "all other persons, firms, corporations, associations or partnerships" held to release all claims, including claims against the manufacturer of the machinery) (emphasis omitted).

B.  <u>Member</u>

{37}  OK Biotech's "member" argument is premised on its contention that OK Biotech's March 19, 2013 purchase of a forty-five percent (45%) membership interest in Prodigy qualifies OK Biotech as a "member" released by TaiDoc under the March 30, 2012 Release Agreement.  (Def.'s Br. Supp. Mot., p. 14, Exs. 1-2, 5.) OK Biotech argues that at the time the Release Agreement was executed, the only members of Prodigy were Admani and Abulhaj, each of whom were parties to the Release Agreement, and that it would have been unnecessary to include the word "members" in the Mutual Release if that term was intended to cover only them. (Def.'s Br. Supp. Mot., pp. 14–15.)  As a result, OK Biotech contends that "members" must necessarily mean "future members" in order to give effect to all the terms of the Mutual Release.  (Def.'s Br. Supp. Mot., p. 15.)

{38} The Court finds OK Biotech's argument unpersuasive. First, OK Biotech's construction is inconsistent with the Release Agreement's language effecting a present release of liability among the parties. *See Hood*, 226 N.C. at 710, 40 S.E.2d at 201. Indeed, the operative language – TaiDoc "hereby releases, remises, quitclaims, and forever discharges" – unambiguously contemplates a present discharge effecting an immediate release of claims upon execution of the Release Agreement on March 30, 2012, and it is undisputed that OK Biotech was not a member of Prodigy when the Release Agreement was executed.

{39} Moreover, under North Carolina law, absent explicit language not present here, a release agreement does not apply to claims arising contemporaneously with or after the release is given. *Fin. Servs. of Raleigh, Inc.*, 163 N.C. App. at 393, 594 S.E.2d at 41–42 (citation omitted). Even "a general release cannot be held to bar a claim which did not exist when it was signed." *Id.* (citing 76 C.J.S. Release § 67, at 619 (1994)).

{40} Furthermore, as discussed above, even if OK Biotech could obtain the benefit of TaiDoc's release under the Release Agreement as a member of Prodigy, the release OK Biotech would obtain would simply be TaiDoc's release of its claims against Prodigy – not a release of TaiDoc's claims against OK Biotech. Again, TaiDoc's claims against OK Biotech were not the subject of TaiDoc's release of claims against Prodigy and cannot now be the object of the release OK Biotech contends it has obtained by becoming a member of Prodigy.

{41} Finally, OK Biotech's contention that "members" must mean "future members" in this context, combined with its argument that the release obtained is of TaiDoc's claims against OK Biotech, leads to the implausible and fully absurd construction that the parties intended that any non-party to the Release Agreement could purchase a release of its liability to TaiDoc – on any claim whatsoever – by purchasing a membership interest in DDI or Prodigy, without TaiDoc having bargained for or contemplated that party's release from liability.

C.  **Designee**

{42}  OK Biotech's "designee" argument is premised on its contention that OK Biotech became a "designee" under the Release Agreement by virtue of Prodigy's assignment to OK Biotech of its "rights, obligations, duties, title and ownership" related to certain 510Ks and its formal designation of OK Biotech as Prodigy's "designee" by execution of the Designation of Release Agreement in April 2014. (Def.'s Br. Supp. Mot., pp. 15–16.)  In short, OK Biotech argues that Prodigy had the unfettered right to designate any person or entity in the world as its designee for purposes of receiving the benefits of the Mutual Release in the Release Agreement, and it chose OK Biotech as its "designee" for these purposes.  Again, the Court finds OK Biotech's argument without merit.

{43}  OK Biotech's legal argument relies on a broad definition of the word "designee" that includes any "person who has been designated to perform some duty or carry out some specific role."  *Black's Law Dictionary* 478 (8th ed. 2004).  OK Biotech completely ignores, however, the context in which the term is used in the Release Agreement, and the directive from our appellate courts that "[a]n excerpt from a contract must be interpreted in context with the rest of the agreement."  *Weyerhaeuser Co. v. Carolina Power & Light Co.*, 257 N.C. 717, 719, 127 S.E.2d 539, 541 (1962) (citation omitted).

{44}  The term "designees" appears as one of three terms expressed together in the Release Agreement – "heirs, executors and designees" – and it is clear that, in context, these three words are intended as similar and related legal terms used to describe types of representatives or successors to a natural person after death.  *See, e.g.*, *Gardner v. Reidsville*, 269 N.C. 581, 591, 153 S.E.2d 139, 148 (1967) ("the meaning of a doubtful word may be ascertained by reference to the meaning of words with which it is associated.") (quotations and citations omitted); *see also* N.C. Gen. Stat. § 28A-1-1(3) (2013) ("'Heir' means any person entitled to take real or personal property upon intestacy . . . ."); *Black's Law Dictionary* at 740 (defining executor as "[o]ne who performs or carries out some act" and "[a] person named by a testator to carry out the provisions in the testator's will").  As such, the Court is

persuaded that the plain meaning of the term "designees" in the Release Agreement is one who is "named or designated" as the executor in a valid will with statutory authority to receive letters of authority for the administration of the testator's estate. *See* N.C. Gen. Stat. § 28A-4-1(a) (2014) (discussing persons "designated" as executor in a will who has not yet been granted letters testamentary by a probate court); *see also, e.g.*, *So. Furniture Co. of Conover, Inc. v. DOT*, 133 N.C. App. 400, 403–04, 516 S.E.2d 383, 386 (1999) ("When terms with special meanings or terms of art appear in an instrument, they are to be given their technical meaning; whereas, ordinary terms are to be given their meaning in ordinary speech.") (citing *Woods v. Nationwide Mut. Ins. Co.*, 295 N.C. 500, 246 S.E.2d 773 (1978)).

{45} In any event, as discussed above, even if OK Biotech could obtain the benefit of TaiDoc's release under the Release Agreement as Prodigy's purported designee, OK Biotech would obtain only TaiDoc's release of its claims against Prodigy – not TaiDoc's claims against OK Biotech. As stated above, TaiDoc's claims against OK Biotech were not the subject of TaiDoc's release of claims against Prodigy and cannot be released by virtue of OK Biotech becoming Prodigy's designee under the Release Agreement.

IV.

CONCLUSION

{46} **WHEREFORE**, for each of the reasons set forth above, the Court finds that Defendant has failed to show that Defendant is entitled to judgment as a matter of law on Defendant's Twelfth Affirmative Defense of Release, and, accordingly, the Court hereby **DENIES** Defendant's Motion for Summary Judgment on its Twelfth Affirmative Defense of Release.

**SO ORDERED**, this the 17th day of July, 2015.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases